[694 NYS2d 82]

In the Matter of KASHMIRA SHAH, Respondent. HELEN HAYES HOSPITAL et al., Appellants.

Second Department, July 6, 1999

---

### APPEARANCES OF COUNSEL

*Eliot L. Spitzer, Attorney General,* New York City (*Thomas D. Hughes* and *Lyssa M. Sampson* of counsel), for Helen Hayes Hospital, appellant.

*Gary C. Samuels,* Pomona, for Noah Weinberg, Commissioner of the Department of Social Services of Rockland County, appellant.

*Fatoullah Associates,* New York City (*Ellice Fatoullah* of counsel), for respondent.

### OPINION OF THE COURT

BRACKEN, J. P.

The Supreme Court held that Mental Hygiene Law article 81 authorizes a guardian, appointed on behalf of an allegedly incapacitated person (hereinafter AIP), to transfer the AIP's assets to that person's spouse for the essential purpose of allowing the spouse to then refuse to use those assets for the payment of the costs associated with the AIP's long term care. The petitioner, who seeks appointment as guardian, assumes that under New York law such a refusal would not disqualify the AIP from eligibility for Medicaid. We agree that such a disposition of the AIP's assets is permitted under the terms of the Mental Hygiene Law, and therefore affirm the order and judgment appealed from.

### I

On August 1, 1996, Bipin Shah suffered head injuries which caused serious brain damage in a work-related accident which occurred in Amityville, New York. He was admitted to Stony Brook Hospital, and on September 29, 1996, he was transferred to Helen Hayes Hospital (hereinafter HHH), which is operated by the New York State Department of Health, and which is located in West Haverstraw, New York. He has been comatose since the time of the accident, and is not expected to improve. The cost of his care amounts to over $1,000 per day. At the time of the accident, Mr. Shah was a chemical engineer with a Masters of Business Administration degree, and was employed

by ACME Corporation. He resided with his wife, the petitioner Kashmira Shah, and the couple's minor son and daughter in Upper Saddle River, New Jersey.

In January 1997 the petitioner Kashmira Shah was advised that the available insurance coverage for the care being provided for her husband at HHH would be exhausted as of January 28, 1997. She was advised that "absent an accepted Medicaid application" both she and her husband would be responsible for the "self-pay rate" at HHH, in the amount of $1,608.13 per day.

On January 16, 1997, Kashmira Shah executed a "Spousal Refusal" form, stating "I declare that I refuse to make my income and/or resources available for the cost of necessary medical care and services for the Medicaid applicant listed above [Bipin Shah] because I need my meager resources to provide for my own old age". On or about January 28, 1997, an application for Medicaid benefits was submitted to the Department of Social Services of Rockland County on behalf of Bipin Shah.

Kashmira Shah then filed a petition pursuant to Mental Hygiene Law article 81 seeking to be appointed as guardian for the personal needs and property management of Bipin Shah. Among the powers which the petitioner sought to obtain in the guardianship proceeding was the power to "transfer the assets of BIPIN SHAH to his wife KASHMIRA SHAH". In the petition, Kashmira Shah specifically asked the court to "authorize her to transfer assets in the name of BIPIN SHAH to [her] so that she can use the assets to support their two children and herself, and so that BIPIN SHAH may qualify for medical assistance".

HHH opposed the guardianship petition. HHH asserted, among other things, that any application for Medicaid benefits made to the Rockland County Medical Assistance program on behalf of Mr. Shah would "likely be denied" due to the fact that Mr. Shah was, at the time of his injury, a resident of New Jersey, so that, at least according to HHH, he would "not qualify for Medicaid through New York". HHH argued that since a transfer of Mr. Shah's assets to his wife would not make him eligible for Medicaid, were the court to allow the proposed transfer of assets there would be no source of funds from which to pay Mr. Shah's debts to HHH.

The Supreme Court held a hearing on February 5, 1997. The petitioner's attorney argued that the petitioner, who must make mortgage payments in the sum of $2,800 per month, and meet other expenses, is entitled to transfer to herself an

amount of assets, characterized by counsel as "an adjusted community spouse resource allowance" sufficient to generate income which would allow the petitioner to enjoy what counsel described as "minimum standard of living * * * which is based on strict guidelines as set forth by Medicaid". As to the issue of Mr. Shah's residence, counsel asserted that, in light of Mr. Shah's inability to form an intent to the contrary, applicable regulations defined his residence as the nursing home or hospital in which he was placed.

The attorney for HHH asserted that the petition failed to mention the outstanding bill in the approximate sum of $5,000 owed by Mr. Shah to HHH. Counsel argued that New York's Social Services Law contained "no right of spousal refusal", but instead provided only that the Department of Social Services must pay Medicaid to an otherwise eligible patient whose spouse has refused to use his or her assets to pay the cost of care. Counsel asserted that the Social Services Law then "gives the Department of Social Services the immediate right to go after that spouse for any expenses incurred", and that the guardianship petition thus constituted, in effect, "just a way of making it difficult for the Rockland County Department of Social Services to get the funds".

At this hearing, a court-appointed "evaluator" suggested that any transfer of assets be contingent upon the granting of Medicaid benefits in New York. In a separate report, this evaluator had also advised the court that New York, unlike New Jersey, allowed the spouse of a Medicaid applicant to refuse to make the his or her assets available for the support of the applicant.

While the guardianship proceeding was still pending, on March 27, 1997, the Department of Social Services of Rockland County forwarded the Medicaid application to the Suffolk County Department of Social Services, apparently because that was the location of Mr. Shah's accident and where he was initially hospitalized. Nevertheless, on March 28, 1997, the Rockland County Department of Social Services made a determination in which it denied the Medicaid application on the ground that the applicant was not a resident of Rockland County. On April 23, 1997, the Suffolk County Department of Social Services also denied the Medicaid application, on the basis that the applicant was not a resident of the State of New York.

In a decision dated May 2, 1997, the Supreme Court stated that it would grant the petition pursuant to Mental Hygiene

Law article 81. The court, in a passage that reflects an apparent unawareness of the fact that the responsible New York agencies had rejected the Medicaid application on the ground that Mr. Shah was not a resident of either Rockland County or New York, stated that "Federal Medicaid rules provide that for an institutionalized individual, residency is where the individual intends to reside. However, if the person is incapable of forming intent, then residency is where the individual is physically present". The court determined that the AIP would, from the standpoint of his residence, qualify for Medicaid in New York. The court also concluded that the proposed transfer of assets would be beneficial to the care of the AIP's wife and two children, thus, apparently finding that the transfer of assets in question had advantages from the standpoint of Medicaid planning.

An order and judgment which, among other things, appointed Kashmira Shah as guardian for Bipin Shah and authorized the transfer of assets, was entered on July 17, 1997. The Department of Social Services of Rockland County and HHH appealed from this order and judgment.

On July 2, 1997, the Commissioner of the New York State Department of Health determined, after a fair hearing, that the determinations of the Rockland and Suffolk County Departments of Social Services as to Mr. Shah's ineligibility for New York Medicaid due to his purported residence in New Jersey were correct. The proceeding pursuant to CPLR article 78 commenced by Kashmira Shah challenging this determination has been transferred to this Court for determination (*see, Matter of Shah v DeBuono,* 257 AD2d 256 [decided herewith]).

## II

The issues raised on the present appeal concern the propriety of the use of the procedure outlined in Mental Hygiene Law article 81 for the essential purpose of transferring the assets of an incapacitated person so as to render such person eligible for Medicaid, and so as to prevent the financial ruin of his or her family. The appellants argue, among other things, that pursuant to the rule announced in *Matter of Gomprecht v Gomprecht* (86 NY2d 47), a "community spouse" such as Kashmira Shah, has the right only to a "sufficient—but not excessive—amount of income and resources", and that there is at least an issue of fact as to whether the asset transfer will result in her having "excessive resources", so that the Supreme Court erred in permitting such a transfer without a hearing. We disagree with this interpretation of *Gomprecht.*

The *Gomprecht* case involved a wife, who in the appropriate jargon may be defined as a "community spouse" (Social Services Law § 366-c [2] [b]), who petitioned the Family Court for an order of support against her husband, who, at the time of the petition, was an institutionalized recipient of Medicaid. The Appellate Division, First Department (*see, Matter of Gomprecht v Gomprecht,* 208 AD2d 452) held that, under Family Court Act § 412, the Family Court had the power to make an order of support in an amount which exceeded the amount the Social Services Law refers to as the "community spouse monthly income allowance" (Social Services Law § 366-c [2] [g]), and which is paid by the institutionalized spouse only to the extent that the institutionalized spouse possesses sufficient means, and only to the extent that the community spouse's own income is below what is defined as the "minimum monthly maintenance needs allowance" (Social Services Law § 366-c [2] [g], [h]; *see also, Matter of Gomprecht v Gomprecht,* 86 NY2d 47, 49-50, *supra*). The "minimum monthly maintenance needs allowance" is then defined in accordance with a formula set forth in the statute, according to which such allowance should not be less than $1,500 per month (*see,* Social Services Law § 366-c [2] [h]). In other words, the statute provides that "the institutionalized spouse's income available to help pay for his/her medical care is reduced by the amount necessary to bring the community spouse up to the minimum monthly needs allowance level" (*Matter of Gomprecht v Gomprecht,* 86 NY2d 47, 50, *supra*). The Appellate Division, First Department, held that the Family Court was free to disregard the guidelines set forth in Social Services Law § 366-c in making an award of support pursuant to Family Court Act § 412.

The Court of Appeals disagreed with this interpretation of the relevant statutes. The Court stated, *inter alia,* "[t]he Family Court's authority to order support under Family Court Act § 412 on behalf of a noninstitutionalized community spouse must be guided by the income standards of Social Services Law § 366-c. Family Court Act § 412 must be read in conjunction with Social Services Law § 366-c and the Family Court is required to apply the minimum monthly needs standard absent a showing of exceptional circumstances" (*Matter of Gomprecht v Gomprecht, supra,* at 52). It is in this context that the Court stated that the basic purpose of the Medicare Catastrophic Coverage Act (42 USC § 1396r-5, as amended by Pub L 100-360, 102 US Stat 754) was " ' "to end th[e] pauperization [of the community spouse] by assuring that the community spouse

has a sufficient—but not excessive—amount of income and re-
sources available" ' " (*Matter of Gomprecht v Gomprecht,* 86
NY2d, *supra,* at 51, quoting *Matter of Schachner v Perales,* 85
NY2d 316, 323; *see also, Matter of Golf v New York State Dept.
of Social Servs.,* 91 NY2d 656).

The appellants urge that this dicta is applicable here. They
argue that any amount transferred to the petitioner may not
exceed what, in another subdivision of Social Services Law
§ 366-c is defined as a "community spouse resource allowance"
(Social Services Law § 366-c [2] [d]), which, like the community
spouse monthly income allowance described above, is calculated
in accordance with certain guidelines set forth in the statute.
The statute expressly allows for the institutionalized spouse to
transfer assets to the community spouse in an amount needed
to raise the community spouse's income to the level of the min-
imum monthly maintenance needs allowance (*Matter of Golf v
New York State Dept. of Social Servs., supra,* at 660).

We agree with the petitioner that the *Gomprecht* rule is
completely inapplicable here, where we are presented not with
a community spouse seeking an order of support against an
institutionalized spouse, but instead with an institutionalized
spouse who (albeit acting by way of a surrogate) wishes in ef-
fect to make a gift of his assets. The scenario is thus totally
different. The *Golf* case is also, in our opinion, not apposite. In
*Golf,* the responsible agency determined that a community
spouse had an income of $1,379.06 per month which was below
her minimum monthly maintenance needs allowance of $1,769.
The agency determined, in effect, to take $389.94 per month
from the institutionalized spouse's income and transfer it to
the community spouse to bring her income up to the minimum
monthly level. However, this methodology (income first) still
left the institutionalized spouse ineligible for Medicaid, given
that he had $13,100 in "excess resources" (*Matter of Golf v
New York State Dept. of Social Servs., supra,* at 660-661). The
community spouse argued that the agency should have
employed an alternate methodology (resource first). Under that
method the $13,100 in excess resources would have been
transferred to her, allowing her to retain the income from those
resources in order to accomplish the increase to her income,
even while preserving the institutionalized spouse's eligibility
for Medicaid. The Court of Appeals disagreed, and upheld the
agency determination (*see, Matter of Golf v New York State
Dept. of Social Servs., supra*).

The *Golf* case does not address a court's power to appoint a
guardian under Mental Hygiene Law article 81, and it places

no restrictions on the right of a person, even when acting through a proxy or surrogate, to make transfers of his or her own wealth.

The complexities of the Medicaid eligibility rules, not to mention the complexities of State and Federal law concerning gift and estate taxation which often come in to play as hapless middle class Americans seek to save themselves from financial ruin as the result of astronomical nursing home costs, should never be allowed to blind us to the essential proposition that a man or a woman should normally have the absolute right to do anything that he or she wants to do with his or her assets, a right which includes the right to give those assets away to someone else for any reason or for no reason. In other words, it is, or should be, clear that Mr. Shah, who had the unrestricted right to give his assets to his wife, or to his children, or to anyone else for that matter, at all times up to the moment of his terrible injury, did not, on account of that injury, lose that fundamental right merely because he is now incapacitated and financial decisions on his behalf must necessarily be made by a surrogate. The relief granted pursuant to Mental Hygiene Law article 81 is designed to permit an incapacitated person to do, by way of a surrogate, those essential things such a person could do but for his or her incapacity (*see, e.g., Matter of Felix v Herman,* 257 AD2d 900). There can be no quarreling with the Supreme Court's determination that any person in Mr. Shah's condition would prefer that the costs of his care be paid by the State, as opposed to his family. It appears to be conceded that, under New York law, Mrs. Shah's execution of the spousal refusal will render Mr. Shah eligible for Medicaid (*see,* Social Services Law § 366 [3] [a]; § 366-c [5] [b]; *Commissioner of Dept. of Social Servs. of City of N. Y. v Spellman,* 173 Misc 2d 979, *affd* 243 AD2d 45).

In light of these considerations, we are in full agreement with the decision of the Appellate Division, Third Department, in *Matter of John XX.* (226 AD2d 79). In that case, the Third Department affirmed a judgment of the Supreme Court which, without a hearing, authorized the transfer, pursuant to Mental Hygiene Law § 81.21 (b), of approximately $640,000 of the assets of an institutionalized stroke victim. This individual was then left with assets of $150,000, which was thought, in light of his income, to constitute an amount sufficient to cover his nursing home costs during the ensuing "look-back" period, that is, the 36-month posttransfer period during which the trans-

ferred assets would be attributed to the institutionalized Medicaid applicant for the purposes of determining his or her financial eligibility.

The Third Department rejected arguments, very similar to those raised before this Court, that the proposed transfer would constitute a "fraud" in that "the Medicaid program was not designed to provide medical benefits to those who render themselves 'needy' through the use of plans such as that proposed here" (*Matter of John XX.*, 226 AD2d, *supra*, at 83). The Court discarded these arguments, and arrived at the only conclusion which is possible given the current status of Medicaid Law, that is, that "current law rewards prudent 'Medicaid planning'" (*Matter of John XX.*, *supra*, at 83). We would only amplify this by saying that no agency of the government has any right to complain about the fact that middle class people confronted with desperate circumstances choose voluntarily to inflict poverty upon themselves when it is the government itself which has established the rule that poverty is a prerequisite to the receipt of government assistance in the defraying of the costs of ruinously expensive, but absolutely essential, medical treatment.

The only distinction of any importance between the facts of this case and those of *Matter of John XX.* (*supra*) is that here, it is all, rather than some, of the incapacitated person's assets that are to be transferred. However, the partial nature of the transfer of the assets in the John XX. case was clearly a response to the existence of the 36-month "look-back" period, that is, the period during which Medicaid benefits might be denied even to a person with no assets at all, based on the fact that, during the preceding 36 months, he or she had made a gift of assets. Here, the "look-back" period is not a factor (*see,* Social Services Law § 366 [5] [d] [3] [ii] [A]; 42 USC § 1396p [c] [2] [B] [i]; *see also, Matter of DaRonco,* 167 Misc 2d 140, 142). Analytically, then, the present case is essentially indistinguishable from *Matter of John XX.* (*supra*), and we are in full agreement with the conclusion reached by our colleagues in the Third Department in that case.

For the foregoing reasons, we conclude that the Supreme Court properly allowed the guardian to transfer the AIP's assets to herself as his spouse. Accordingly, the appeal from the decision is dismissed as no appeal lies from a decision (*see, Schicchi v Green Constr. Corp.,* 100 AD2d 509), the order and judgment is affirmed, insofar as appealed from, and the order is affirmed.

SULLIVAN, FRIEDMANN, and FLORIO, JJ., concur.

Ordered that the appeal from the decision is dismissed; and it is further,

Ordered that the order and judgment is affirmed, insofar as appealed from; and it is further,

Ordered that the order is affirmed; and it is further,

Ordered that the respondent is awarded one bill of costs.